# COURT OF APPEALS OF TEXAS.

## TYLER TERM, 1884.

[No. 1759.]

### FED. AND CHARLES CONNER v. THE STATE.

1. EVIDENCE — BILL OF EXCEPTIONS.— The action of the court below in receiving alleged incompetent evidence is not revisable by this court in the absence of a bill of exceptions showing that such evidence was objected to when it was first offered.

2. SAME — CHARGE OF THE COURT.— It is not error to refuse a special charge when the general charge upon the subject-matter presents correctly the law controlling it.

3. SAME — CIRCUMSTANTIAL EVIDENCE — CASE STATED.— In a joint prosecution against two defendants for murder, wherein the criminative evidence against both was purely circumstantial, the trial judge charged the jury as follows: "The evidence in the case before you being wholly circumstantial, in so far as it relates or is applicable to the case of the defendant Charles Conner, it is necessary," etc. *Held*, error with respect to the case of Fed. Conner, because such charge expressly limits the law of circumstantial evidence to the case of Charles Conner, and authorizes the jury to infer that the guilt of Fed. Conner was not dependent alone upon such character of evidence, but was supported, in part at least, by direct evidence.

4. SAME.— Failure of the trial court to charge the law of circumstantial evidence, when such evidence alone is relied upon to support a conviction, is reversible error, whether or not such error was excepted to at the proper time.

5. MURDER — EVIDENCE — FACT CASE.— See the statement of the case for evidence, which, though circumstantial, is *held* sufficient to support a conviction for murder in the second degree.

APPEAL from the District Court of Sabine. Tried below before the Hon. J. J. Perkins.

The appellants were jointly indicted for the murder of Eli Lowe and Kit Smith, in Sabine county, Texas, on or about the 1st day of December, 1883. They were jointly tried, and the appellant Fed. Conner, being convicted of murder in the first degree, was awarded a life term in the penitentiary, and the appellant Charles Conner, of murder in the second degree, with his punishment assessed at a term of twenty-five years in the penitentiary. The conviction of the former is reversed; of the latter, is affirmed.

Alex. McDaniel was the first witness for the State. He testified

that he lived in Sabine county, Texas, about four hundred yards distant from the house of the deceased Kit Smith. On Thursday, the 6th day of December, 1883, he learned that Kit Smith and Eli Lowe were missing, and he joined a party to search for them. From his house the witness went to the house of Jack Lowe, thence to the house of George Williams, returning to Jack Lowe's house by William Ferguson's. Jack Lowe, John Enner, Elmer Harper and the witness took one route in the search for the missing parties, and George Williams, William McDonald and Rube Smith took another route. The two searching parties met at a point on the bayou, and together followed a trail up the Holly bottom, a short distance, to a point where the dead bodies of Kit Smith and Eli Lowe were found. The bodies lay about ten or twelve feet apart, between Holly bottom and Housin's bayou. Smith lay on his back, his feet under him, his head resting on the ground, and his hands drawn upward. He had been shot through the head. Lowe's body lay on the face, partly in the water, with the hands drawn up underneath and near the face. Rain had fallen on both the 5th and 6th days of December, and the bodies were both wet. Lowe's body was moved from the water; that of Smith was not then disturbed. Smith's gun, empty, broken off at the breach, and bent, was lying near his head. Lowe's gun was found in the water. The witness saw Smith's shot pouch, but could not remember whether or not it was then on the body. The bodies of the dead men were found about a half hour by sun, on Thursday evening, December 6, 1883, at a point on Housin's bayou about six miles from and east of Hemphill.

Smith and Lowe, the deceased, lived about two miles apart; Smith north, and Lowe about an equal distance south of Housin's bayou. The witness saw the horses of the deceased on the morning after the discovery of the bodies. Lowe's horse was shot in the side, behind the shoulder. The sweat leather and other parts of the saddle were also penetrated by shot. This horse was found about a hundred yards distant from where the bodies lay. Smith's horse was found in his field. He had not been shot.

George Williams, the next witness for the State, testified that he was one of the searching party that found the bodies of Smith and Lowe on the edge of the Holly bottom, on the 6th day of December, 1883. Smith lay on his back; Lowe on his face. Witness moved Lowe's body from the water at the request of Jack Lowe. Smith's body was not touched until the coroner's party arrived. Lowe had on a shot pouch, and, the witness believed, Smith did too. Jack Lowe, McNaughton, Billy McDaniel, John Enner, Alex.

McDaniel and others were present.  Both bodies were stiff; Smith's the stiffer of the two.  The guns of both the dead men were broken at the breach, and the barrel of Smith's was bent.

Doctor J. W. Smith testified, for the State, that, on the night of December 6, 1883, he went to Holly bottom, a noted place on the Housin bayou, to see the bodies of the deceased.  Judging from appearances, the witness would say that the two men had been dead about twenty-four hours.  Smith was shot through the right side or shoulder and in the back, with buckshot, and through the left temple with a large rifle ball.  The man who shot Smith in the back and shoulder must have been standing behind him.  The shot in the temple ranged downward into the throat, towards the body.  The witness did not think this last shot could have been inflicted as it was, unless the deceased was lying down with his head inclined backwards, and the shooting party standing over him.  The range of the shot in Lowe's eye, which was fired at very short distance, was downward.  Lowe was otherwise shot in the shoulder, these two wounds being inflicted by mixed loads of buck and squirrel shot.  Witness also found two pistol ball wounds in Lowe's back, about five inches apart.  His hands were drawn up near his face, and in one hand he held a piece of gun patching.  Two pieces of patching were found on Smith's body; one a piece of colored new cloth, and the other a piece of white domestic.  Witness saw the colored piece on the *habeas corpus* trial of the defendants.  The buck and squirrel shot taken from the body of Lowe, and two buck-shot taken from the back of Smith, were identified by the witness.  He also identified the pieces of patching taken from the two bodies, particularly the colored piece taken from the body of Smith.  Though the wound in the eye of Lowe might possibly have been inflicted while he was in a standing position, the witness was satisfied from surrounding circumstances that Lowe was lying prostrate on the ground when that wound was inflicted.  When the witness probed the wound in Kit Smith's temple, the body was lying very nearly in the same position it lay when that wound was inflicted.  At that time the head must have been raised a little, and the party firing the shot must have stood over the head.  Witness was a practicing physician, and as such was familiar with the human anatomy.  The wounds in the bodies of Kit Smith and Eli Lowe were sufficient to, and did unquestionably, produce the death of each.

J. O. Toole was the next witness for the State.  He testified that he was a member of the jury of inquest which sat upon the bodies

of Kit Smith and Eli Lowe, in December, 1883. Two pieces of patching, one colored and one white, were found on the body of Kit Smith. Witness did not remember who took them from the body, nor from what part of the body they were taken. To the best of his recollection, the colored piece was taken from the shoulder. A colored piece of new homespun cloth was here shown to the witness. He identified it as a piece he had seen before. When it was taken from the body of the deceased Smith it was stained with blood. It appeared to have been handled a great deal since witness first saw it. A piece of white domestic wadding was found in Lowe's hand, from which it was taken by Doctor Smith. Witness identified the same. Lowe had one wound in the left eye, another in the arm, and another in the back.

The witness did not remember that he stated on the *habeas corpus* trial of defendants that he took the patching from Smith's body. Witness put the small piece of white patching in a box, where he kept it until he produced it on the *habeas corpus* trial. According to the recollection of the witness, Mr. L. N. Morris took charge of the piece of homespun patching at the inquest. The color of that piece was similar to the color of the piece now shown the witness. On the night of the inquest, the witness could only distinguish the blue and white colors in the piece of homespun patching taken from Smith's body. The white piece of patching exhibited, the witness identified as the piece taken from Smith's face, and which he preserved in the box. The three pieces of cloth exhibited are, according to the belief of the witness, the identical three pieces taken from the bodies of Kit Smith and Eli Lowe.

Tillman McDaniel testified that he was present when the inquest was held over the bodies of the dead men in the Holly bottom. A load of buckshot penetrated the shoulder of Lowe, another penetrated his eye, and two pistol balls entered his body. The body of Kit Smith lay with the head east and the feet drawn up and extending west. The witness was not with the party that discovered the bodies. He saw nothing on the body of Kit Smith. When the witness arrived at the place where the inquest was held he found present Jack Lowe, William McDaniel, John Enner, Rube Smith, William McNaughton, Elmore Harper, and perhaps others.

L. N. Morris testified, for the State, that he was present at the inquest. A piece of gun wadding was taken from the body of Lowe, and a piece of colored patching was taken from the body of Smith. The witness found the piece of colored patching between the collars of Smith's coat and shirt, and on the day after the inquest gave

it to Judge Whittlesey. He also gave to Judge Whittlesey some buck and squirrel shot, extracted from the two bodies. No small shot was found in the body of Smith. Witness saw no wounds on Lowe's legs. One piece of patching was taken from one of Lowe's hands, and possibly more than the one piece found by witness were taken from Smith's body. The piece found by the witness was checked in two or three colors, blue, white and copperas. The white was a very small stripe. Witness did not remember, but thought, the copperas stripe was composed of four threads. He remembered nothing about the combination of colors in the checks. He had never before seen any as coarse as the piece referred to. The piece of cloth now shown witness does not contain four copperas threads, but witness was confident that it is the same piece of cloth he took from the body of Smith and delivered to Judge Whittlesey.

Judge J. A. Whittlesey testified, for the State, that as coroner he held the inquest over the dead bodies of Smith and Lowe. He remembered that some pieces of cloth were taken from the bodies at the time of the inquest. L. N. Morris handed witness some patching and bullets, taken from the bodies, which witness inclosed and sealed in an envelope, and gave to W. T. Arnold, clerk for the grand jury. The envelope exhibited is the one in which witness inclosed the articles described. The piece of homespun cloth exhibited is very similar to a piece found on one of the bodies.

W. T. Arnold testified, for the State, that Judge Whittlesey delivered to him a sealed envelope to be given to the grand jury. It was afterwards returned to witness by the grand jury. The cloth and the bullets inclosed in that envelope were afterwards exhibited by the witness on the *habeas corpus* trial of the defendants. These articles have since been in the possession and custody of the witness, except that for a day or two they were in the custody of W. W. Weathered.

W. W. Weathered, for the State, identified the piece of colored cloth exhibited as the same given to him by Mr. Arnold, as a piece taken from the dead body of Smith. Witness had it exclusively in his own possession until he returned it to Arnold.

The widow of the deceased Kit Smith was the next witness for the State. She testified that she last saw her husband, alive, after dinner on the 5th day of December, 1883, in Sabine county, Texas. Eli Lowe, deceased, who was the witness's cousin, was with him. The two left the witness's house together, about 1 o'clock, to go to Eli's house, to run some bullets for Smith's rifle. Witness's husband said that he would return that evening, but the witness did not

again see him alive. She heard of his death late the next evening. Her husband not returning on the night of December 5th, the witness became uneasy, and next day went to Alex. McDaniel's and asked him to institute search. The feeling between the Conners and witness's husband was very bad at that time. Eli Lowe came to Smith's house early on the morning of the 5th, and the two men left, as stated, just after dinner. Both carried small rifles, and Smith took his shot pouch with him.

Mrs. Sallie Lowe, the widow of the deceased Eli, was the next witness for the State. She testified that her husband died about December 5, 1883. On the morning of that day he went to the houses of Alex. McDaniel and Kit Smith, and returned with the latter after 1 o'clock. Smith moulded some bullets while at Lowe's house, and when he started to return home he asked Lowe to go with him. Lowe consented to go as far as the Holly bottom, saying that he had some hogs to look after. The Holly bottom was on the road to Smith's house. They took their guns and rode horseback. A slight rain fell about fifteen minutes after the two men left Lowe's house. It rained harder towards night. Witness thought that she heard the report of a gun late that evening. The Holly bottom was about a mile north from Lowe's house. The witness had no recollection of seeing any armed party or parties about the Lowe place on that day, or within a few days before the 5th. Witness very often saw Willis, Fed., John and Bill Conner about the Lowe place, armed with guns. They usually went armed, and were often seen riding along back of the Lowe field. Witness did not remember having seen any one of the Conners during the week previous to the killing. She last saw them about two weeks before the killing.

Jack Lowe was the next witness for the State. He testified that he lived about ten miles east from Hemphill in Sabine county, Texas. The witness was first informed that Eli Lowe and Kit Smith were missing, on Thursday, December 6, 1883, when he organized a searching party. He met another searching party near the point where a trail left the road leading from Eli Lowe's house to Kit Smith's house. The parties followed this trail and soon found the bodies in the edge of the Holly bottom, on a dim horse trail, about midway between the houses of Eli Lowe and Kit Smith. The sun was then about one hour high. Cane, taller than an ordinary man, grew quite thick east of the trail. It was not so dense on the opposite side. The body of Eli Lowe lay, face downwards, in a drain. The body was moved out of the water. Smith's

body was not moved until after the coroner's party arrived. Lowe had three buckshot wounds in the left leg, below the knee.

The witness, on the day before the killing, Tuesday, December 4, 1883, saw Fed. and Willis Conner, at a crossing of Six-mile creek, about three quarters of a mile distant from his, witness's, house. As the witness and his son Ike Lowe, driving some hogs, came up out of the Six-mile creek bottom, Willis Conner hailed the witness, and said: "By G—d, somebody has been bothering my hogs." The witness replied that he had not. Willis Conner then said: "If you have not, your boys have, and they must stop it." This conversation was kept up for perhaps twenty-five minutes, during which Willis Conner said to witness: "You and Eli ran over a hog of mine in the road six or eight years ago. By G—d, you cannot deny that." To this the witness made no reply. Witness then told Willis Conner that if his, witness's, boys were ever caught dogging or abusing the Conner stock, he, witness, was willing, and would pay any damage resulting, and asked the Conners to watch his boys, and promised to watch them himself. To this Willis Conner replied: "It is no use to watch. You may watch a wolf all summer, and yet he will eat the pigs in the fall." Fed. Conner, one of the defendants, who was present, said nothing until near the close of the conversation, when he remarked: "Fussing is bad business. We had as well drop it, and go on to the ones who have done it." Willis Conner replied that if "it was not done here, it was done on the trail that runs by your (witness's) hammock field." Willis Conner further said: "If any body catches me bothering their stock, I want them to shoot me down like a wolf, and leave me in the woods, and I intend to do the same, and to make it my rule." Witness remarked that in pursuing such a course he might hurt innocent parties; to which Willis replied: "When men dog my stock, I know whether they do it accidentally or on purpose."

During this conversation, Willis and Fed. Conner, who were on foot, had their shot-guns, and witness, who was horseback, had his Winchester rifle, the butt resting on his thigh. As witness started off he shifted the position of his gun, placing it crosswise of the saddle in front, the muzzle pointing towards the Conners. Willis Conner jumped somewhat, brought his gun to a half present, and told witness to "take that gun off of me." Witness changed the position of his gun, and rode off. During the conversation related, the witness's son Ike joined the party. This all happened about 8 o'clock in the morning, on Fed. Conner's land, near his "new ground." The residue of this witness's testimony in chief relates

to the topography of the neighborhood, the locations of the various houses of the parties in interest, and has no material bearing upon any issue involved.

On his cross-examination, the witness testified that in speaking of his, witness's, boys, he supposed Willis Conner referred to his son Ike, fifteen years old, and Elmore Harper, a lad sixteen or seventeen years old, who was then living with witness. Witness told Eli Lowe of the treatment he received from the Conners on this occasion, and cautioned him. The parties who customarily traveled the trail that led by witness's hammock field were Alex. McDonald, George Williams, Kit Smith, Eli Lowe and witness. This trail led from witness's house to the house of Eli Lowe. Witness cautioned Eli because he inferred from Willis Conner's remark that he suspected the parties who traveled this trail of troubling his hogs.

Miss Octavene Cooper was the next witness for the State. She testified that she left the house of the defendant Charles Conner, on the Sunday before the killing of Lowe and Smith, having made that house her home for the previous six weeks. During the time she lived at Charles Conner's house, at the dining table, and in the presence of Mrs. Charles Conner and the children, she heard Charles Conner say that Billy Conner told him that Eli Lowe had run his, Billy Conner's, hogs out of the Holly bottom, and that he, Charles, was going to help Billy watch the bottom and protect his hogs, and that Eli Lowe had better not run them out again. The witness was present on the *habeas corpus* trial of the defendants and saw a piece of colored homespun cloth, which she now identifies as the same piece in evidence. Willis Conner had a loom at his house some six weeks before the killing. The loom at that time contained a piece of cloth very much like the piece in evidence. Witness did not notice it particularly while it was in the loom, but saw that it contained copperas. The witness saw Willis Conner's daughter, Miss Nan, with a new dress made of a fabric exactly like the sample in evidence. The cloth in the loom and Miss Nan's new dress were exactly alike, both containing copperas, blue and white. Being shown another piece of cloth, witness said that it was unlike Miss Nan's new dress, and the cloth she saw in the loom. Witness had never counted the threads in any of the pieces of cloth testified about. The filling of the cloth in the loom and in Miss Nan's new dress was blue, the warp being copperas. Witness thought she saw Miss Nan wearing the new dress spoken of at the house of witness's sister. That sister was Mrs. Charles Conner. She did not know how often she saw Miss Nan at Charles Conner's house. The cloth was in the loom

when witness paid her first visit, during the six weeks described, to Willis Conner's house. Whether or not it was still in the loom when witness made her second visit, she could not remember, but she knew that it was not in the loom when she last visited Willis's house. Witness paid more attention to Miss Nan's dress than she did to the cloth in the loom. She could not say how long it was before the killing that she saw Miss Nan's new dress. Witness saw a loom in the house of her uncle, Jack Lowe, a long time before the killing. Jack Lowe married the sister of the witness's mother. Kit Smith and Charles Conner married sisters, who are half sisters to the witness. Eli Lowe was a cousin of the witness.

Sam W. Everett was the next witness for the State. He testified that he had lived at the houses of Fed. and Willis Conner as a laborer, off and on, for two years, occasionally, but for short periods, staying at the house of Charles Conner. Fed. and Willis Conner were married men and lived near together. John and Billy Conner were single men and lived with their father, Willis Conner. The witness had heard Willis, Fed., Billy and John Conner talk in a very abusive manner about Eli Lowe and Kit Smith, cursing and abusing them and Jack Lowe. Sometime before the killing of Smith and Eli Lowe, Fed. Conner remarked to witness: "I asked McDaniel who threw his (McDaniel's) fence down, when Kit Smith up and answered: 'I don't know who in the h—ll it was.' Now wasn't that a h—ll of an answer to make a white man?" The Conners customarily cursed and abused Jack and Eli Lowe about bothering their hogs. Fed. Conner, one of the defendants, spoke of Eli Lowe but seldom, but then in very unfriendly terms. Witness had never, to his recollection, heard Charles Conner speak of Lowe or Smith. Witness knew of two little difficulties between Eli Lowe and Billy Conner. The first occurred about six months before the killing, at the raising of a bridge over Six-mile creek. They passed a few words, when the crowd huddled around them. Witness was then standing on the opposite side of the creek. Fed. Conner was present at the time, but took no part in the difficulty that the witness observed. Charles Conner was not present. This row was not amicably settled, and Billy Conner afterwards talked as though he was not satisfied.

The witness could not say that he had ever heard the defendant Fed. Conner say anything indicating his feeling towards Kit Smith. He could not, in fact, say, with regard to Fed., that he had ever heard him curse, or speak well or ill of Eli Lowe, but knew that he talked of Lowe in such manner as to convey the impression that he felt very

unkindly towards him.    He did not know that Fed. Conner and Eli Lowe were or were not on speaking terms.    He had never seen them meet.    Fed. Conner and Kit Smith were not on friendly terms. Witness did not remember any special thing that Fed. had ever said about the Lowes, but the Conners generally used to accuse the Lowes of dogging their hogs, cutting off their tails, and the like. Bill Conner and Eli Lowe were the principals in the bridge difficulty, but Willis Conner " put in " occasionally.    The witness stated that " Willis, John and Bill Conner cursed Jack Lowe, Eli Lowe, George Williams and Kit Smith, unanimously."    Willis Conner's house was something of a common headquarters of the Conner family, and the cursing and abuse of Eli Lowe and Kit Smith was common fireside-talk.    The witness generally slept at Willis Conner's house, even while he was working for Fed. Conner.    Witness had never heard Alfred or Charles Conner say anything about Smith or Lowe.    During the last fall witness saw some cloth in and out of the loom at Willis Conner's house.    That cloth was very like the colored piece of patching in evidence.

On cross-examination the witness testified that he had had some experience in court in Louisiana.    A man named Brad. Carter accused the witness of breaking into his store.    " We had a trial about that, you bet."    Witness sent to Mississippi and had his character established under seal, and he was never prosecuted under the charge of housebreaking.    It then became a question among his friends and the people whether the witness had best kill Brad. Carter or sue him for slander.    His mother-in-law being alive at the time, the witness decided to bring the slander suit.    He intrusted this piece of litigation to a lawyer named Fisher Smith.    The result was that lawyer Fisher Smith got all the money realized by the suit, and the witness came out " flat."    Witness formed the acquaintance of the Conners about eighteen months before the killing.    He could not remember every little matter he stated on the *habeas corpus* trial.    Witness was here shown a piece of homespun cloth larger than the patching first shown him, but containing the same colors somewhat differently arranged.    This piece of cloth, he testified, looked very like the cloth he saw in Willis Conner's loom, but not as much like it as the small piece of patching.    Some parties went to Louisiana after the witness, but in any event the witness would have been present.

John E. Marshall, the next witness for the State, testified that, on Wednesday, the day of the killing, he was in the employ of Willis Conner, splitting rails.    Witness, with Joe and Clark Ford, went to

their work immediately after dinner on that day. They were at work about a quarter of a mile northeast from Willis Conner's house. Willis, Fed., John, Charley and Billy Conner passed witness and the Fords, where they were at work, a short time after dinner. They were traveling the trail, going in a northeast direction, when they passed out of the view of the witness. Willis, Fed., John and Charles Conner had guns. Billy had no gun.

Alex. McDaniel was recalled on behalf of the State. The material part of this additional statement of the witness was, that he and Kit Smith lived equi-distant — about a mile — from the Housin bayou. The witness heard three reports of fire-arms on the evening of December 5, 1883, in the direction of the Holly bottom. Possibly he heard more, but he was certain of three. A sprinkling rain had fallen, and perhaps it was raining a little when the witness heard the reports. These reports attracted the witness's attention because he thought it strange that any one should be hunting while heavy clouds were threatening a storm. Within thirty minutes after the witness heard the shots, a very heavy rain fell. The sun shone out brightly after the heavy rain, and when it was about a half hour high. The firing of guns in and about the Holly bottom was not an unusual occurrence. Willis Conner's house was at least three and a half miles distant from the Holly bottom. No houses are passed in going from Willis Conner's to the Holly bottom.

William McDaniel and Jack Lowe testified that none of the Conners were present at the burials of Kit Smith and Eli Lowe.

Joe Ford, a negro, was the next and the most important witness for the State. He corroborated the testimony of the witness Marshall as far as it went. In addition he testified that when the Conners passed him, Clark Ford and Marshall where they were splitting rails, on the evening of the killing, Willis and Charles Conner each carried a combined rifle and shot-gun. Fed. and John Conner each carried a rifle. Bill Conner had no gun, but, before he left the house, the witness saw him put a pistol in his pocket. He could not say that Bill Conner had the pistol when he passed witness with the other Conners. Within an hour after this party passed the witness, Clark and Marshall, it rained, or rather sprinkled. Within a short time a brief shower fell, and somewhat later a heavy rain fell. Between the shower and the heavy rain, and perhaps before the shower was well over, the witness heard four distinct shots. The first two were fired in quick succession from shot-guns. A slight intermission was followed by two discharges from rifles. These guns were fired in the direction of the Holly bottom. Wit-

ness would not swear to more than four shots, though he may have heard others. Witness, Clark Ford and Marshall went to the house to escape the shower, and returned to work after it passed over. When about a quarter of an hour high, the sun shone out brightly. When they left the house after dinner, the Conners said they were going to the Holly bottom, hog hunting.

On his cross-examination the witness stated that about a half hour after dark Willis, John and Fed. Conner came back to Willis's house, driving some hogs. Before they reached the house, Mrs Willis Conner, who heard them coming, came to the gallery and told witness, Clark and Marshall to get some wood for the kitchen, and pine to make a light in the house. Witness got some pine and Clark and Marshall some wood, and reached the gate, returning with it, just as the three Conners named passed through with the hogs. They drove the hogs to the lot, put up their horses, and returned to the yard where witness and his companions were yet standing with the wood and pine. As Willis Conner passed he told witness, Clark and Marshall to go to the kitchen and get supper. The gallery steps and the gate were but few steps apart and immediately opposite. A room stood on the west end of the gallery. Just before the witness turned the corner of this room on his way to the kitchen, Willis Conner met his wife at the steps. She then asked him: "Did you do what you went to do?" Willis replied: "Yes, by G—d, I did." His wife then asked: "Are you sure they are dead?" Willis replied: "Yes, by G—d, they are, and they won't steal any more of my hogs, nor dog any more of my stock." Mrs. Conner then asked Willis if he was quite sure "they were dead," and if he had not "better go back and see if they were quite dead." The witness had not quite turned the corner and was within a few feet of Willis when this conversation commenced. The remainder he heard from behind the corner of the room, where he stopped and listened.

While the witness was standing behind the corner of the room described he could see John and Fed. Conner at the further end of the gallery, whispering together, but could not hear what was said. John and Fed. were some six or seven feet from Willis and his wife, which was nearer than the witness was. Witness went to the kitchen and ate his supper. He then moved a fire he had built under a wagon shelter to the sugar shelter. While still at the wagon shelter, which was about a half hour after Willis, Fed. and John got home, Bill Conner arrived. Having moved the fire, witness went to the yard to get a gourd of water. After that he passed

entirely around the house and hid behind a chimney of the room in which the Conners had collected. Peeping around the chimney, through a window, the witness saw Fed. and Bill Conner sitting near it. He also saw John Conner, Miss Nan and Mrs. Conner, and Willis Conner as he crossed the room, and heard the several parties talking. He heard William Conner say: "I guess the d—d son of a b—h won't curse me any more. I took two pops at him with John's Smith & Wesson pistol, and she is as good as Mollie ever rubbed her leg over." Willis Conner said: "Eli begged mightily, but he was just a year too late. It didn't do any good. He had no business bothering my stock. He had warning not to go into my stock range." The witness saw the whole family in the room described, but did not see Mrs. Conner, Miss Nan and John until he left the chimney and was passing the window.

The witness stated that he left the chimney after Bill Conner's remark about taking two pops at Eli, which were made after Willis's remark about the same person. Witness was twice taken before Judge Whittlesey during the examining trial, but testified nothing about these conversations. He told Judge Whittlesey on those two occasions that it would not do for him to tell what he knew about the matter, as the Conners were then at large, and he was afraid to endanger his life. Witness did say on the examining trial that he had told no one about these conversations, but as a matter of fact, on Thursday evening, being the evening after the killing, witness's half brother, Warren Jackson, told witness that Lowe and Smith were lost; to which witness assented, saying that they were so well lost that they would not be found until found by the buzzards. He also told Henry Smith, during the Christmas holidays, that the two men were killed by the Conners, and that he had heard the Conners talking about it. He did not tell Henry Smith that the killing occurred in a hollow next to where he was at work, and that he heard the struggle and could have seen it if he had desired.

During the week preceding the killing, the witness was at Fed. Conner's house. One morning before breakfast, Willis Conner came to the house to see about some hogs that had got into the pasture. Witness went to a shed adjoining the room in which the two Conners — Willis and Fed.— were, to get an ax, and while there he heard them talking about the price of pork. Having to purchase pork himself, he listened, and heard Willis Conner, in the course of the conversation, ask: "When are we going to stop those d—d rascals?" to which Fed. replied: "The first chance we get." Willis retorted: "If we don't stop them soon, we won't get any

hogs this fall." Witness did not know what parties were under discussion at the time.

On another occasion, shortly before the killing, while witness was eating breakfast in the stone room, John Conner came to the door with some cartridges in his hand, and said: "These are what will take them in. If a man won't do right, you ought to make him." The cartridges looked larger than buck-shot cartridges. Witness did not know to whom John Conner was then alluding. Charles Conner was not present at any of the conversations referred to, nor did he return to Willis Conner's house on that night — the night of the killing. The State proved the time and venue of the homicide, and closed; the defense offered no testimony. The correctness of the charge of the court and the sufficiency of the evidence were called in question by the motion for new trial.

No briefs for appellants have reached the Reporters.

*J. H. Burts*, Assistant Attorney General, for the State.

WILLSON, JUDGE. I. We are not called upon to determine whether or not the statements made by Willis and William Conner, on the night after the murder, were properly admitted in evidence. There is no bill of exceptions in the record showing that they were objected to by the defendants. In his charge to the jury the learned judge fully and correctly instructed in relation to these statements, and as to the extent to which they might be considered by the jury. The jury were told in the charge that they should not consider these statements against the defendant Charles Conner, because he was not present when the same were made. "But," proceeds the charge, "if you should find that said declarations, conversations and statements occurred and were made at said time and places, by said parties, as testified to by said witness, and that the defendant Fed. Conner was present, and in such a position that he heard them; and that they were of such a character, and occurred under such circumstances, that called for reply on his part, or that silence or acquiescence amounted to assent, then you are authorized to consider the same in connection with the other evidence in the case in determining the guilt or innocence of the said Fed. Conner." This was a correct exposition of the law upon this subject, and the special instructions requested by the defendants' counsel upon the same subject were properly refused. (*Long* v. *The State*, 13 Texas Ct. App., 211.)

II. We regard the evidence upon which the convictions are based as wholly circumstantial as to both the defendants. There is no

direct evidence that either of them committed the murders or participated in their commission. The statements made by Willis and William Conner did not amount to a confession or admission that they had killed Eli Lowe and Kit Smith, or either of them. We would naturally and reasonably *infer* from these statements, and the circumstances under which they were made, that they related to the murders in question, and that Willis and William Conner had perpetrated the murders. But still they are not *direct;* but only circumstantial evidence of the correctness of such inference. If the statement had been, "We, Willis, William, Fed. and Charles Conner killed Eli Lowe and Kit Smith," it would have been a confession of guilt, and *direct* evidence of guilt, against the person making the same, and also perhaps against any one of the persons named who was present and heard the statement and did not deny the truth of it. But no such direct and explicit confession is contained in the statements in evidence, and they can only be regarded, like all the other evidence in the case, as circumstantial.

In instructing the jury upon circumstantial evidence, the learned judge commences his charge upon this subject as follows: "The evidence in the case before you being wholly circumstantial in so far as it relates or is applicable to the case of the defendant Charles Conner, it is necessary," etc. Thus he expressly limits his charge upon circumstantial evidence to the case of Charles Conner, thereby giving the jury to understand that the case of Fed. Conner did not depend wholly upon that character of evidence, but was supported, in part at least, by direct evidence. This, we think, was error. The charge upon circumstantial evidence should have been made applicable to the case of Fed. as well as to the case of Charles. It was a part of the law of both cases, and its omission from the charge, as has been repeatedly held, was error for which the judgment must be reversed, although such error was not excepted to at the trial. (*Faulkner* v. *The State*, 15 Texas Ct. App., 115; *Garcia* v. *The State*, Id., 120; *Cook* v. *The State*, 14 Texas Ct. App., 96; *Lee* v. *The State*, Id., 266.)

As to the conviction of Charles Conner, we find no error in it. There is no error in the charge as to him, and in our opinion the evidence, leaving out of view the statements of Willis and William Conner, is sufficient to sustain the verdict of the jury.

The judgment as to Fed. Conner is reversed and the cause as to him is remanded. As to Charles Conner the judgment is affirmed.

*Ordered accordingly.*

[Opinion delivered October 15, 1884.]